562 So.2d 883 (1990)
Lawrence HUTCHINSON
v.
LIVINGSTON WOOD PRODUCTS and Aetna Life & Casualty Company.
No. 89-C-2966.
Supreme Court of Louisiana.
June 4, 1990.
Dissenting Opinion June 19, 1990.
*884 Robert E. Palmer, Ponchatoula, for Lawrence Hutchinson, plaintiff-applicant.
R. Michael Caldwell, Franklin, Moore & Walsh, Baton Rouge, for Livingston Wood Products, et al. defendents-respondents.
Dissenting Opinion by Judge Watson June 19, 1990.
SHORTESS, Justice Pro Tem.
The issue before us is whether the lower courts erred in failing to award plaintiff additional worker's compensation benefits.
Lawrence Hutchinson (plaintiff) was employed as a woodcutter by his uncle, Jerry Johnson. Johnson, in turn, was an independent contractor who cut and delivered wood to Livingston Wood Products (defendant). While performing his duties on April 10, 1985, plaintiff was using a chain saw which unexpectedly kicked back and cut his foot. The resulting laceration ran along the top of the foot lengthwise, cutting not through but into the top layer of bone and severing one of the arteries in the foot as well as a sensory nerve. Surgery to repair the damage was performed, and the foot was placed in a short cast. After six weeks, plaintiff began to exercise the foot and toes to restore movement. Despite the fact that plaintiff's treating physician believed he could return to work after July 10, 1985, plaintiff refuses to do so because of continuing pain, inability to wear a shoe without serious discomfort, and fear of future injury. In the meantime, defendant paid plaintiff temporary total benefits from the date of the injury, April 10, 1985, through July 10, 1985. Compensation was paid in the amount of $67 per week, based on Johnson's testimony that plaintiff's average earnings were no more than $100 per week.
In the record are depositions from two orthopedic surgeons. The treating physician, Dr. Larry Ferachi, testified that at the time of injury, plaintiff had fractures of the metatarsals and lacerations of the tendons running to four of his toes. In addition, the dorsalis pedis artery and the nerve on the top of the foot were "chewed up" so badly they were not repairable. In the next few months, plaintiff's injured bones appeared to heal properly. However, when he continued to complain of pain, physical therapy was ordered. The *885 swelling of the foot decreased, but plaintiff still could not wear a shoe.
Three months after the surgery, plaintiff continued to describe the pain in the top of his foot as severe. At that time, Ferachi found plaintiff had limited extension of the toes, and he was not sure if plaintiff would gain any increased motion in his foot. Even though Ferachi conceded plaintiff could possibly regain some motion in the toes, he found it unlikely: "[I]f they're stuck at three months, they're probably going to be stuck later." Therefore, as of July 3, 1985, Ferachi found plaintiff had a twenty percent permanent partial disability in the left foot due to his pain and limited motion. Ferachi thought plaintiff should be able to return to work but said he would be limited by his subjective pain, the sincerity of which Ferachi found no reason to doubt.
After this July examination by Ferachi, plaintiff continued to complain of pain and was seen at the defendant's request by orthopedic surgeon Dr. Joe Morgan on September 24, 1985. During this examination some two and one-half months after plaintiff was last seen by Ferachi, Morgan found a complete range of motion in the foot and toes and only minimal tenderness when firm pressure was applied. Morgan attributed a five percent residual disability to the injury based not on loss of function but on loss of the sensory nerve. On the date of this examination, Morgan did not find plaintiff's pain severe enough to justify prescription of medication, continued treatment, or special shoes. Even though plaintiff complained of having to walk on the side of his foot, Morgan observed no limp. He concluded nothing more could be done for plaintiff and that he could return to work.
Thereafter, plaintiff was seen once more by Dr. Ferachi in December of 1986. At that time, a year and nine months after injury, plaintiff was still complaining of pain and discomfort over the distal part of the foot in the area of the fracture. Although there was no swelling, plaintiff had "very minimal motion to the metatarsal phalangeal joints, [and] decreased sensation over the dorsal digits." Ferachi said there was not much he could do for plaintiff other than to put him on a mild anti-inflammatory drug and discharge him. Both Ferachi's deposition and the report of this examination were offered as joint exhibits at trial. Thus, plaintiff's most recent medical examination shows that almost two years after the accident he was still in pain and unable to move his toes.
Before this final examination, plaintiff filed suit for additional benefits, alleging that benefits were arbitrarily and capriciously terminated, that he is eligible for disability under the "odd lot" doctrine, and that the benefits he was paid were calculated on the basis of an incorrect average weekly wage. The trial court rejected these arguments, finding that plaintiff's benefits were properly terminated in July of 1985 when a preponderance of the evidence showed he was no longer disabled to perform his normal duties. The trial court also found plaintiff failed to prove total and permanent disability resulting from his injury and rejected without reasons the claim for such an award under the "odd lot" doctrine. Finally, since plaintiff's employer, Johnson, stated clearly and unequivocally that plaintiff's average weekly earnings were $100, the trial court found the basis of the worker's compensation benefits was correct.
The court of appeal, First Circuit, found the trial court's factual findings were not clearly wrong. 553 So.2d 1113. Plaintiff sought writs in this Court, arguing that he is entitled to rehabilitative services and that the "odd lot" doctrine is applicable. He also contended the lower courts have incorrectly interpreted the burden of proof, have failed to adjust his benefits in light of the seasonal nature of his work, and have erred in failing to assess penalties and fees.
Plaintiff contends he has constant pain and aching in his foot and that it feels numb all the time. He is unable to move his toes, and the blood in his foot does not properly circulate. He cannot put on a regular shoe because his foot swells and hurts if he does so. The cold and damp *886 weather exacerbates his pain and he walks with a cane because his leg has given out upon exertion. When asked why he has not returned to work, plaintiff said:
I can't go back out there in the woods and try fighting all over the briars and stumps and stuff like that.... I ain't going to do nothing but get hurt or fall down or something because my leg will probably give out on me.... [The ground] don't be level. It just be, you know, sometimes a couple of wet spots and sometimes briars you be in, and stump holes and sometimes you fall in.
Plaintiff's vocational expert, Raymond Hyde, reviewed the medical evidence and interviewed plaintiff in March of 1987. Hyde testified plaintiff is basically a functional illiterate who was socially promoted in school. He is able to print his name but cannot write or read to any significant degree, has no knowledge of basic current events, and has problems communicating. Plaintiff's employment history shows that although his work has been part-time and seasonal, he has done "fairly arduous and heavy work" all his life. Based on the fact that the only work for which he is suited requires plaintiff to stand on his feet for long periods and to use gross movements and body strengths, Hyde said any percentage of disability might decrease plaintiff's ability to perform his duties. Hyde further stated that if plaintiff is unable to perform hard labor, he knew of no realistic jobs that would be available to him.
Plaintiff's testimony concerning his chronic pain was corroborated by objective medical testimony. Both orthopedists assigned permanent loss of sensation and differing percentages of disability. Both offered hypothetical explanations of the source of plaintiff's ongoing pain. Ferachi suggested that soft tissue damage was the cause, while Morgan believed plaintiff may suffer from a neuroma. Neither doctor believed the pain is psychologically based.
Although Dr. Morgan found plaintiff primarily suffers from anesthesia or loss of sensation in his foot, the record is silent as to whether the full range of motion Morgan reported was active or passive. On the other hand, examinations by the treating physician both prior and subsequent to the examination by Morgan show a much higher degree of restricted motion. Thus Ferachi found plaintiff had a twenty per cent loss of use of his foot and that further mobility would most likely not be regained. When Ferachi again examined plaintiff a year and nine months after the accident, he found "very minimal" motion in the metatarsal phalangeal joints. Ferachi's evaluations, favorable to plaintiff, were introduced as joint exhibits at trial. These assessments support plaintiff's contention that his activities have been severely restricted since injury due to pain and loss of function in the foot.
If a plaintiff is injured in a work-related accident, he is covered by terms of the Louisiana Worker's Compensation Law, LSA-R.S. 23:1021 et seq. The record shows plaintiff was performing duties arising out of and incidental to his employment in the course of defendant's business, LSA-R.S. 23:1035, and the terms of the statute thus apply. The Louisiana act comprehends three items of loss to the employee. If he has suffered a disability of some kind, he is entitled to a sum which partially compensates him for his loss of earning capacity. Second, he is entitled to medical and hospital expenses and related costs. Finally, he may be entitled to a small sum, the so-called "schedule" loss, for the loss of certain enumerated limbs or organs without regard to the effect such loss may have upon his earning capacity. Malone & Johnson, 13 La.Civ.Law Treatise, Worker's Compensation (2d ed.), § 271 at 594. The record fails to establish either disability or entitlement to further medical benefits. If plaintiff is entitled to relief, therefore, it will be under the terms of the "schedule" losses.
The provisions of Louisiana's Worker's Compensation Law were extensively amended through Act 1 of the First Extraordinary Session of 1983 (La.Acts 1983, 1st Ex.Sess. No. 1, amended LSA-R.S. 23:1221 effective July 1, 1983.) Plaintiff's injury occurred after the effective date of the act and before later amendments to the *887 statute; this case is therefore governed by those 1983 amendments. With the 1983 amendments, schedule loss benefits became known as permanent partial disability benefits. These are defined by LSA-R.S. 23:1221(4)(q) which at the time of injury provided that no benefits shall be awarded for permanent, partial disability unless:
anatomical loss of use or amputation, as provided in Subparagraphs (a) through (o) of this Paragraph or loss of physical function as provided in Subparagraph (p) of this Paragraph is greater than fifty percent as established by the American Medical Association Guides to the Evaluation of Permanent Impairment, copyright 1977, by the American Medical Association.
The 1985 amendments to the statute lowered the threshold to allow recovery where loss of physical function is twenty-five percent; however, that amendment took effect after the date of plaintiff's injury. In addition, that provision would still afford no relief where the disability to the foot is rated, as is plaintiff's, at twenty percent. However, the schedule for specific losses also provides for compensation for these losses:
(c) For the loss of ... a big toe, sixty-six and two-thirds percent of wages during twenty weeks.
(d) For the loss of any toe, other than a big toe, sixty-six and two-thirds percent of wages during ten weeks.
. . . .
(o) In all cases involving a permanent partial anatomical loss of use ... of the members mentioned hereinabove, compensation shall bear such proportion to the number of weeks provided for herein for the total loss of such members as the percentage loss or impairment to such members bears to the total loss of the member, provided that in no case shall compensation for an injury to a member exceed the compensation payable for the loss of such member.
LSA-R.S. 23:1221(4) (Emphasis added.)
In determining whether a plaintiff is entitled to compensation for loss, we have said the opinion of a physician or other medical expert about disability does not necessarily determine legal disability. Johnson v. Insurance Co. of North America, 454 So.2d 1113, 1117 (La.1984):
A medical witness may possess a peculiar competence to testify on questions of medical causation and of possible relation of symptoms to the medical injury. His opinion as to the degree of residual pain, or its legal consequences, is not necessarily as persuasive. 3 Larson, Workmen's Compensation Law, § 79.50-79.54 (1971). (Emphasis added.)
Johnson v. Travelers Insurance Co., 284 So.2d 888, 891 (La.1973). According to the testimony of both the treating physician and plaintiff himself, due to pain and loss of function, plaintiff has suffered a nearly total loss of the use of the toes on his injured foot. This permanent loss of use and function falls within the definition of "anatomical loss," see Malone & Johnson, supra, (1990 P.P.) § 282 at 163, and is thus compensable under the statute. Furthermore, where multiple specific injuries are suffered, the compensable periods for the individual losses are cumulative but are subject to the limitation that compensation for the loss of more than one toe cannot exceed that given for a foot. LSA-R.S. 23:1221(4)(l); Malone & Johnson, supra, § 283 at p. 656. Although Ferachi rated plaintiff's foot as having a twenty percent disability, no medical evaluation has been made of the extent of the disability in the toes of that foot. Nevertheless, for the reasons given, we conclude that as a legal matter, plaintiff has a 100 percent loss of function in the toes and is, therefore, entitled to compensation for his loss.
Plaintiff received thirteen weeks of temporary total disability in the amount of $67 per week in the period immediately following injury. We disagree with counsel's contention that these previous benefits were based upon an incorrect average earnings figure. Counsel did not produce documentation nor subpoena employment records to support his contention to the contrary. At the same time, plaintiff's employer and uncle, Jerry Johnson, unequivocally stated that plaintiff could not have *888 earned greater than an average of $100 per week. This figure, used to compute past benefits, is also the proper figure upon which future benefits should be based.
Furthermore, defendant is entitled to credit for the total temporary disability payments plaintiff received during convalescence. LSA-R.S. 23:1223 provides:
When compensation has been paid under R.S. 23:1221(1), (2), or (3), the amount of such payment shall be deducted from any compensation allowed under R.S. 23:1221(4)....
We thus find plaintiff is entitled to sixty-six and two-thirds percent of his average past wages of $100 per week for a total of sixty weeks, the accumulated period for total loss of the toes on his left foot. R.S. 23:1221(4). Defendant has previously paid benefits of $67 for a period of thirteen weeks and is accordingly credited for the prior payments.
Finally, plaintiff claims defendant's termination of benefits was arbitrary and capricious and that defendant is thus liable for penalties and attorney's fees as provided in LSA-R.S. 23:1201 and 23:1201.2. This assignment is without merit. No physician recommended or apparently believed that plaintiff would benefit from further medical treatment. The insurer was entitled to terminate benefits on July 10, 1985, after Dr. Ferachi released plaintiff to return to work.
The judgments of the lower courts are reversed, and judgment is rendered for plaintiff in accordance with the reasons set forth above. All costs are taxed to defendant.
REVERSED AND RENDERED.
WATSON, J., dissents and assigns reasons.
WATSON, Justice, dissenting.
The majority opinion holds that "these assessments support plaintiff's contention that his activities have been severely restricted since injury due to pain and loss of function in the foot." Nevertheless, the opinion goes on to say "the record fails to establish either disability or entitlement to further medical benefits."
The majority seems to hold, and I agree, that the plaintiff has indeed proved disability. Here is a plaintiff, who cannot read or write to any significant degree, who has no knowledge of current events, and whose foot gives him so much trouble due to pain and limitation of motion that he can no longer work as a logger. My conclusion is that for the reasons stated in the majority opinion, the plaintiff is entitled to disability benefits.
Therefore, I respectfully dissent.